UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES DEMARCO RICHARDS,<br><br>    Petitioner,<br><br>    v.<br><br>KIM HOLLAND,<br><br>    Respondent. | No.  1:16-cv-00139-LJO-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation serving a sentence of two terms of 25 years-to-life, plus 28 years, for his conviction of multiple sex offenses.  In this action, Petitioner claims defense counsel rendered ineffective assistance by failing to object to admission of evidence seized outside the scope of the search warrant; failing to object to admission of evidence concerning a cell phone battery; and failing to object to admission of items of women's clothing.  The Court finds that the state court rejection of these claims was not contrary to, or an unreasonable application of, Supreme Court precedent and recommends the petition be **DENIED.**

I.    **PROCEDURAL HISTORY**

On December 21, 2013, Petitioner was convicted in the Fresno County Superior Court of forcible rape, sodomy by use of force, three counts of forcible oral copulation, attempted sodomy by use of force, and two counts of dissuading a witness by force or threat, with weapons

1

enhancements as to all counts. (Doc. No. 1 at 1.) On February 13, 2014, he was sentenced to serve an indeterminate term of 50 years-to-life plus 34 years. (Id. at 1.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On October 27, 2015, the Fifth DCA issued its opinion striking the weapons enhancement on two counts, and affirming the conviction in all other respects. The matter was remanded to the superior court for resentencing. Petitioner did not petition for review in the California Supreme Court. On February 16, 2016, the Fresno County Superior Court resentenced Petitioner to two terms of 25 years-to-life plus 28 years.

Petitioner next filed multiple habeas petitions in the Fresno County Superior Court, Fifth DCA, and California Supreme Court. (LD 17, 19, 21, 23, 25, 27.) The petitions were denied at all levels. (LD 18, 20, 22, 24, 26, 28.)

On January 29, 2016, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. No. 1). Respondent filed an answer on April 21, 2016. (Doc. No. 16). Petitioner filed a traverse to Respondent's answer on May 13, 2016. (Doc. No. 18.)

## II.     FACTUAL BACKGROUND[1]

*Jane Doe 1*

In November, 2011, Jane Doe 1 advertised her services as a prostitute on a website called Backpage. (RT[2] 469-70.) On November 25, 2011, Jane Doe 1 made arrangements with Petitioner by text messages and phone calls for a meeting to perform oral sex for money. (RT 470.) That night, Petitioner drove and picked up Jane Doe 1 down the street from her house. (RT 471.) They then drove to a cul-de-sac nearby. (RT 472.) Petitioner got out of the car and came around to Jane Doe 1's door. (RT 474.) Jane Doe 1 asked for payment up front. (RT 474.) Petitioner asked if he could pay afterwards, but she said no. (RT 474.) Petitioner then smiled, took out a knife, and said, "We can either do this the easy way or the hard way. (RT 474.)

Jane Doe 1 responded that she would "do this the easy way." (RT 475.) He told her to

---

[1] The state courts did not set forth a statement of facts on appeal or collateral review. Therefore, the statement of facts are derived from the state appellate record.

[2] "RT" refers to the Reporter's Transcript on Appeal which has been lodged with the Court by Respondent.

2

orally copulate him and that he would kill her if she bit him.  (RT 475.)  She then orally copulated him for about 30 to 60 seconds.  (RT 476-77.)

Petitioner told Jane Doe 1 to get up and turn around.  (RT 477.)  She complied, fearing he would kill her.  (RT 477.)  Her pants were pulled down and she bent over.  (RT 478.)  Petitioner put a condom on and had vaginal intercourse with her.  (RT 478.)  At one point, he attempted to sodomize her but his penis would not go in.  (RT 480, 1029.)  Petitioner told her she was lucky that he didn't have any lubricant.  (RT 480, 1029.)

Petitioner then stopped and told her to sit back down.  (RT 479.)  She complied while he took his condom off.  (RT 479.)  He told her to orally copulate him again, which she did.  (RT 479.)  He told her that she had to "swallow every last drop or else he was going to cut [her] throat."  (RT 479.)   He then ejaculated in her mouth.  (RT 480.)  She swallowed "some of it" but "kept some of it in [her] mouth."  (RT 480.)

After he finished, Jane Doe 1 stood up and started crying.  (RT 481.)  Petitioner told her to stop crying or he would cut her throat.  (RT 481.)  Petitioner told her, "You don't know how bad I want to hurt you right now."  (RT 481.)  Jane Doe 1 begged with him, stating, "Please."  (RT 481.)  Petitioner then told her to set her cell phone down in the street, and she complied.  (RT 481.)  He told her the phone would be there after he left.  (RT 481.)  He told her to walk into the middle of a field and count to 100.  (RT 482.)  She started to walk into the field and he followed her.  (RT 482.)  She kept walking past a building, and then turned around, but Petitioner was gone along with her phone.  (RT 483.)

When Jane Doe 1 saw that Petitioner was gone, she ran as fast as she could to a highway.  (RT 483.)  She attempted to flag down the passing vehicles and finally a lady stopped.  (RT 483.)  Jane Doe 1 told her what had happened and asked her for something to spit into.  (RT 483.)  The lady offered her something such as a napkin and Jane Doe 1 spit into it.  (RT 484.)  The police then arrived.  (RT 484.)  She was then taken to a building to have a rape kit performed.  (RT 484.)  She declined because she wanted to go home to her kids.  (RT 485.)  The police retained her clothes, and she advised them that she would go to the emergency room the following morning.  (RT 485.)

At trial, Jane Doe 1 identified Petitioner as the man who attacked her. (RT 488.) She had also previously identified Petitioner in a photo lineup. (RT 496, 1002.)

*Jane Doe 2*

In December of 2011, Jane Doe 2 was working as a prostitute. (RT 705.) She advertised her services in the "Redbook" website. (RT 706.) She was contacted by Petitioner through Redbook, and arrangements were made for Petitioner to pick her up at the Greyhound bus station to transport her to her hotel room. (RT 706.)

On December 17, 2011, Jane Doe 2 traveled from Oakland to Fresno by Greyhound. (RT 708-09.) Petitioner picked her up at the station and she gave Petitioner information on her hotel. (RT 710.) Petitioner agreed to drive her to her hotel. (RT 711.) Petitioner did not take her to the hotel, however. (RT 711.) Instead, he took an exit from the freeway and drove to a dead end in a very dark area surrounded by warehouses. (RT 711.) Petitioner then told her that they "should just do this here." (RT 711.) Jane Doe 2 agreed and she asked if they should get in the back of the vehicle. (RT 711.) Petitioner agreed and got out of the car and came around to her door. (RT 711.) Once he was standing in front of her, he pulled out a knife. (RT 711.) He then told her, "Do you want to do this the hard way or the easy way?" (RT 713, 927.) She didn't say anything, but she wanted to run away. (RT 713.) He told her, "Don't run," and then grabbed her by the arm and walked her over near the warehouse. (RT 713.) Petitioner told the victim that he would kill her if she did not cooperate. (RT 713.)

Once they were in the middle of a field, Petitioner put his jacket on the ground and told her to get down. (RT 714.) He took her money and phone. (RT 714.) He told her to get on her hands and knees. (RT 714.) She complied out of fear for her life. (RT 714.) He told her to orally copulate him, and she did. (RT 715.) He told her to call him, "Master." (RT 715.) Petitioner then put on a condom and sodomized her until he ejaculated. (RT 716-18, 781.)

After Petitioner was finished, he took the battery out of Jane Doe 2's cell phone so she couldn't call for help. (RT 719, 758.) He started pacing back and forth like he didn't know what to do with her. (RT 720.) She believed he was thinking of how to kill her and what to do with her body. (RT 720.) He then told her to go behind the warehouse and count to 100 until he was

4

gone. (RT 720.) She begged him to leave her things on the side of the road because she didn't have any clothes, shoes or socks. (RT 720.) He told her to count to 100 and not look back or he might be there and kill her. (RT 720.) She proceeded to count to 100 and came from around the warehouse corner and he was gone. (RT 721.) She ran to where his car had been but none of her things were left. (RT 721.) Among other things, she was missing her boots, two or three pairs of heels, and her cell phone battery. (RT 722.)

Jane Doe 2 then ran from the scene barefooted until she saw a street sweeper on the street. (RT 721.) She knocked on his window crying and asking for help. (RT 721.) The street sweeper called the police and ambulance. (RT 722.) The police arrived and contacted Jane Doe 2. (RT 723.) Initially, she did not state she was a prostitute for fear of being arrested. (RT 723.) But later, she admitted she was. (RT 723.) The police took her to a rape center where tests were performed. (RT 723.)

At trial, Jane Doe 2 identified Petitioner as the one who attacked her. (RT 730.)

Jane Doe 2 was physically examined by Debra Neal, a forensic nurse specialist, approximately two hours and forty-five minutes after the assault took place. (RT 917, 942.) Ms. Neal asked to insert an anoscope into the victim's rectum, but the victim refused. (RT 937.) Ms. Neal testified that rape victims more often than not refuse to have an anoscope placed in their rectum. (RT 937.)

*Additional Evidence*

The prosecution introduced further evidence connecting Petitioner to the two crimes. When Petitioner's vehicle was searched, a battery pack was located on top of a condom wrapper inside the center console. (RT 971, 973-74.) Surveillance video showed footage of a vehicle matching the description of Petitioner's vehicle in the area on the night of the incidents. (RT 982.) Petitioner's cell phone number was discovered in the cell phone records of Jane Does 1 and 2. (RT 986, 994-99.) Multiple cell phones, two laptops, and a knife resembling the one described by Jane Doe 1 were recovered from Petitioner's former residence. (RT 1006-08, 1022-26.) The black boots belonging to Jane Doe 2 were recovered from Petitioner's former bedroom. (RT 1010-11.) In Petitioner's new apartment, items of women's clothing, footwear, purses and

jewelry were recovered.  (RT 1016-35.)  A forensic examination of Petitioner's laptops revealed numerous visits to escort sites such as "My Redbook," "backpage.com," and "onlinebootycall.com."  (RT 1112.)  The forensic examination also revealed visits to sex sites such as "brutalsex.com," "forced teenage sex movie.com," and "online gangbangs.com."  (RT 1114.)  The website "brutalsex.com" described itself as containing "rape videos, brutal porn, brutal rape porn, shocking rape porn, brutal rape videos, . . . ."  (RT 1115.)  One of the visited sites contained an advertisement: "Watch full brutal sex videos.  Rape those bitches here."  (RT 1117.)

DNA testing was conducted on semen samples taken from Jane Doe 1's mouth.  (RT 1122-52.)  The testing revealed that the semen belonged to Petitioner to a high degree of probability.  (RT 1152.)

*Defense*

Petitioner testified in his own defense.  (RT 1163.)  Petitioner stated he had met Jane Doe 1 approximately four or five years previously, and he had a consensual sexual encounter with her involving oral sex on the first occasion.  (RT 1165.)

On the date in question, November 25, 2011, Petitioner responded to an advertisement for prostitution on the "backpage.com" website, and coincidentally, the individual turned out to be Jane Doe 1.  (RT 1167.)  Petitioner admitted to carrying the knife in question, but stated he carried it for his own protection because Jane Doe 1 wanted to meet him in an unfamiliar and possibly dangerous location.  (RT 1173.)  He admitted to driving her to the cul-de-sac.  (RT 1175.)  Once there, he pulled his penis out and guided her to his penis in order to give him oral sex.  (RT 1176.)  She initially refused to perform oral sex until he paid her, but he convinced her otherwise.  (RT 1176.)  During the act, Jane Doe 1 took the condom off and Petitioner asked her to swallow the semen so it wouldn't make a mess.  (RT 1176-77.)  She refused, and Petitioner responded that if she wanted to get paid she would have to swallow it all.  (RT 1177.)  She stated if that he ejaculated in her mouth, she would bite the head of his penis off.  (RT 1177.)  At that point, Petitioner took out his knife and warned her not to bite his penis.  (RT 1177.)  Jane Doe 1 got scared and jumped back into her car seat.  (RT 1178.)  She said if he pulled out the knife again, the whole deal was off.  (RT 1178.)  He told her he wasn't trying to scare her, but he didn't

1  want to get bit. (RT 1178.) He then told her, "Look, we can do this the easy way or the hard
2  way. Either you finish and get paid or you can walk home." (RT 1178.) She then performed oral
3  sex, and he ejaculated in her mouth. (RT 1178.) Petitioner stated she apparently didn't swallow,
4  but got out of the vehicle. (RT 1178.) He believed she was going to spit out the semen. (RT
5  1179.) He then leaned out the window and called her an offensive term, and drove off without
6  paying her. (RT 1179.) Petitioner denied having threatened her, having vaginal intercourse with
7  her, or having attempted to sodomize her. (RT 1180-82.) As he was driving, he noticed Jane Doe
8  1 had left her cell phone in the car, and he proceeded to throw it out the window. (RT 1184.)

9  Petitioner contacted Jane Doe 2 by responding to her advertisement for prostitution on
10  "myredbook.com." (RT 1185.) Petitioner agreed to pick her up at the Greyhound bus station in
11  Fresno. (RT 1186.) An arrangement was made where Petitioner would pay her $80 for 15 to 20
12  minutes of sex. (RT 1186.) Petitioner picked up Jane Doe 2 at the bus station and she
13  immediately asked for $100 payment. (RT 1187.) Petitioner corrected her and told her that they
14  had agreed on $80 over the phone. (RT 1187.) Petitioner also told her he did not want to pay
15  until afterwards because he was afraid she would not do what they had agreed upon. (RT 1188-
16  89.) Petitioner stated she needed the money up front to pay for a motel room. (RT 1189.)
17  Petitioner stated he was not going to pay up front so she suggested they do it in the car instead,
18  and then he could pay her the money. (RT 1189.) He stated he did not have a knife with him on
19  this occasion. (RT 1190-91.)

20  Petitioner drove Jane Doe 2 to the same location he had gone to with Jane Doe 1. (RT
21  1193.) Petitioner asked if she wanted to do it in the back seat, but she declined because her things
22  were back there and there wasn't enough room. (RT 1193.) Jane Doe 2 suggested they walk to
23  the building where she could lean against the wall. (RT 1193.) Jane Doe 2 then took off her
24  boots and left them in the car. (RT 1194.) She walked with Petitioner to the building. (RT
25  1195.) Once they neared the building, Jane Doe 2 took off her pants and Petitioner smelled a foul
26  odor coming from her privates. (RT 1195.) Petitioner changed his mind and told her that he
27  didn't want to do anything because of the foul odor. (RT 1195.) Jane Doe 2 told him he still
28  needed to pay her for her time. (RT 1195-96.) Petitioner refused and told her "she was crazy,"

7

but he offered to give her a ride to the motel. (RT 1196.) They then began arguing and Jane Doe 2 began "flipping out, screaming, yelling." (RT 1196.) She then told him he could either pay her the money or she would call the police and tell them that he had raped her. (RT 1197.) Petitioner immediately left. (RT 1197.)

When he got back home, he discovered her boots and her things were still in his car. (RT 1197.) Petitioner later felt bad about the situation and attempted to call her in order to return her things and compensate her. (RT 1198.) He spoke to either her or her friend on the phone. (RT 1198.)

Petitioner denied forcing her to have sex with him, and denied having participated in any sex act with her. (RT 1198-99.) He denied ever using a knife. (RT 1199.) He admitted to using his laptops for the purpose of visiting websites devoted to dating and prostitution. (RT 1199.) He denied visiting any websites devoted to depictions of brutality or violence toward women. (RT 1199.) He stated that those websites were visited on the day he was arrested and implied that someone else had visited them while using his laptops. (RT 1200.) He stated that he had let other people use his laptops in the past, and in particular, on the night and morning of that day. (RT 1200-01.)

## III. DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

      B.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C. Review of Petition

The instant petition presents the following grounds for relief: 1) Defense counsel rendered ineffective assistance by failing to object to admission of evidence seized outside the scope of the search warrant, failing to object to admission of evidence concerning a cell phone battery, and failing to object to admission of items of women's clothing. (Doc. No. 1 at pp. 5-25.)

*1. Federal Standard*

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply

10

and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

   2. *Failure to Object to Evidence Seized Beyond Scope of Search Warrant*

Petitioner first alleges that defense counsel rendered ineffective assistance by failing to move to suppress evidence of pornographic websites because the search had exceeded the scope of the search warrant.

The claim was presented in a petition for writ of habeas corpus to the Fifth DCA and

rejected in a reasoned decision as follows:

> Petitioner's challenge to counsel's alleged ineffectiveness ignores the fact that the search warrant authorized officers to search and seize:
>
> > "Any and all evidence related to the sexual assaults documented under FPD Crime Report number 11-82925 and 11-87949.  The evidence shall include, but will not be limited to, [what follows is an extensive list of items]."

(LD 26.)

The claim was then presented to the California Supreme Court, and the claim was denied without comment.  (LD 28.)

The Fourth Amendment to the United States Constitution protects against unreasonable searches, in addition to unreasonable seizures.  U.S. Const. amend. IV.  Although a failure by defense counsel to file a suppression motion "does not constitute per se ineffective assistance of counsel," it may form the basis of an ineffective assistance of counsel claim.  Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).  To demonstrate deficient performance on such a claim, "a meritorious Fourth Amendment issue" is a necessary prerequisite. Id. at 382.

Here, Petitioner fails to establish a Fourth Amendment claim.  Law enforcement searched his computers pursuant to a valid warrant.  The state court determined that the evidence was not improperly admitted under state law, and the Court is bound by that determination.  Bonin v. Calderon, 59 F.3d 815, 841 (9th Cir. 1995).  Even if the Court were not bound by that determination, it is clear the state court ruling was not unreasonable.  The pornographic materials were related to the assaults since they had a tendency to show Petitioner acted with the required mental state and he had a motive to commit the assaults.  ($CT^3$ 401-02.)  Therefore, defense counsel's performance was not deficient because a suppression motion would have had no chance of success. See Knowles, 556 U.S. at 127.

Moreover, in light of the admissible evidence presented at trial, Petitioner cannot demonstrate that the result of his trial would have been different had counsel lodged objections to the admission of the pornographic sites.  The evidence against Petitioner was strong and included

---

[3] "CT" refers to the Clerk's Transcript on Appeal which has been lodged with the Court by Respondent.

testimony from the two victims and citizens who offered aid. In addition, there was evidence in the form of DNA evidence, 911 calls, and the presence of the victims' belongings in Petitioner's home and vehicle.

In sum, Petitioner fails to show that counsel's performance was deficient or that he suffered prejudice as a result. He has not shown that the state court rejection of this claim was contrary to or an unreasonable application of Supreme Court authority. The claim should be rejected.

### 3. *Failure to Object to Evidence of Cell Phone Battery*

Next, Petitioner alleges counsel rendered ineffective assistance by failing to object to the admission of a cell phone battery that was seized from Petitioner's car. He claims it was never found that the battery was one that had been taken from the victim.

This claim was raised in the state superior court where it was rejected as follows:

> Petitioner argues that he received ineffective assistance of counsel when his attorney failed to file a motion to suppress evidence of various items of property that were found in his residence and vehicle. . . .
>
> However, the Court finds that Petitioner has raised these identical claims in prior petitions filed with this Court. This Court denied those petitions. (See *In re James DeMarco Richards*, Case Nos. 14CRWR682287, 15CRWR682640.)
>
> "It has long been the rule that absent a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected." (*In re Clark* (1993) 5 Cal.4th 750, 767.) While Petitioner has attached additional trial transcripts that he argues provide further support for his contentions, the Court finds that Petitioner has not demonstrated a change in the applicable facts or law and Petitioner has not demonstrated a fundamental miscarriage of justice would result from the failure to reconsider these claims. (*In re Clark, supra*, 5 Cal.4th 750, 797.) Consequently, the Court finds that Petitioner has failed to present a viable claim for habeas corpus relief.

(LD 20.)

The claim was raised to the California Supreme Court where it was denied without comment. (LD 28.)

A search of Petitioner's vehicle revealed a battery pack located on top of a condom wrapper inside the center console. (RT 971, 973-74.) At trial, Jane Doe 1 testified that Petitioner used a condom during the assault. (RT 478.) She also testified that Petitioner took her cell phone. (RT 481.) Jane Doe 2 testified that Petitioner used a condom when he sodomized her.

13

(RT 716-18, 781.) She further testified that after Petitioner was finished, he took the battery out of Jane Doe 2's cell phone so she couldn't call for help. (RT 719, 758.) The battery pack and the condom wrapper had some tendency to confirm the victims' statements and were therefore relevant. Therefore, any objection by defense counsel would have been futile. Counsel cannot be faulted for failing to raise a meritless objection.

In addition, Petitioner fails to demonstrate any prejudice. He admitted he used a condom with Jane Doe 1. (RT 1173-77.) He also admitted that he took Jane Doe 1's cell phone. (RT 1184.) He further admitted that he had kept Jane Doe 2's boots and personal items. (RT 1197.)

Given the state the of the evidence, the state court could reasonably conclude that the omission of the cell phone battery would have had no reasonable probability of affecting the outcome of the jury's determination that the encounters were non-consensual rather than consensual. Petitioner's claim of ineffective assistance thus fails and the claim should be rejected.

### 4. *Failure to Object to Admission of Items of Women's Clothing and Shoes*

Petitioner also faults counsel for failing to object to the admission into evidence of items of women's clothing, shoes, and belongings that were not his but were discovered in his residence.

This claim was raised to the superior court and rejected. The state court found that Petitioner had "failed to prove that his trial counsel provided ineffective assistance of counsel because Petitioner had failed to establish that his attorney's failure to either review the search warrant that was issued or to file a motion to suppress evidence caused his defense to suffer any prejudice." (LD 18.)

This claim must also be rejected for the same reasons discussed above. The items of women's clothing had some tendency to confirm the victims' statements that he had kept their personal items. Therefore, the evidence was relevant. Any objection by defense counsel would have been futile.

In addition, the state court reasonably determined that Petitioner did not suffer prejudice. The case against Petitioner was strong and included testimony by the victims, testimony by

14

witnesses who had rendered aid, 911 phone calls, and DNA evidence.  In addition, Petitioner admitted to keeping Jane Doe 2's items.  The absence of this evidence would have had no effect on the jury's determination that the sexual encounters were nonconsensual rather than consensual.  Therefore, Petitioner fails to demonstrate that defense counsel was ineffective, and the claim should be denied.

## IV.     RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus (Doc. 1) be **DENIED** with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

   Dated:   **January 26, 2017**                    **/s/ Jennifer L. Thurston**
                                                     UNITED STATES MAGISTRATE JUDGE